# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **KARLY A. DUNCAN,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 2:13cv00028 |
| ) | **MEMORANDUM OPINION** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Karly A. Duncan, ("Duncan"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

- 1 -

Case 2:13-cv-00028-PMS   Document 19   Filed 10/01/14   Page 1 of 19   Pageid#: 1620

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Duncan protectively filed her application[1] for SSI[2] on January 6, 2010, alleging disability as of January 11, 2010,[3] due to bipolar disorder, problems with her back, right shoulder and right knee, depression and anxiety. (Record, ("R."), at 35, 292-97, 309, 314, 344.) The claims were denied initially and on reconsideration. (R. at 213-15, 219-21, 224-25, 227-29, 231-33.) Duncan then requested a hearing before an administrative law judge, ("ALJ"). (R. at 234-35.) The hearing was held on January 18, 2012, at which Duncan was represented by counsel. (R. at 27-98.)

By decision dated January 27, 2012, the ALJ denied Duncan's claim. (R. at 15-26.) The ALJ found that Duncan had not engaged in substantial gainful activity since January 6, 2010, the date of her application. (R. at 17.) The ALJ determined that the medical evidence established that Duncan suffered from severe

---

[1] Duncan also protectively filed an application for disability insurance benefits, ("DIB"), on January 6, 2010. (R. at 292-93.) However, it was determined that Duncan did not qualify for DIB because she had not worked long enough. (R. at 207-09.)

[2] On September 5, 2008, Duncan protectively filed applications for SSI and DIB alleging disability beginning October 20, 2004. These claims were denied initially and upon reconsideration. (R. at 172-74, 178-80, 183-85, 189-91, 194-96, 198-202, 204-05.) A hearing was held on November 30, 2009. (R. at 108.) By decision dated December 18, 2009, the ALJ denied Duncan's claims. (R. at 108-22.) The Appeals Council denied Duncan's request for review. (R. at 167-70.) There is no indication that Duncan pursued any further action concerning this denial.

[3] At her hearing, Duncan amended her alleged disability date to January 11, 2010. (R. at 35.) Although Duncan listed October 20, 2004, and December 19, 2009, as her alleged onset date in her applications for DIB and SSI, she confirmed at her hearing that it was January 11, 2010. (R. at 35, 292, 294.)

impairments, including bipolar disorder, depression, anxiety disorder, degenerative disc disease, degenerative joint disease of the right shoulder and substance abuse, but he found that Duncan did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that Duncan had the residual functional capacity to perform simple, routine, repetitive sedentary work[4] that did not require more than occasional climbing, balancing, stooping, kneeling, crouching, crawling and reaching overhead with her right upper extremity, that required only frequent handling with her right upper extremity, that did not require concentrated use of moving machinery and exposure to unprotected heights and that allowed only occasional interaction with the public and co-workers. (R. at 19.) The ALJ found that Duncan was unable to perform her past relevant work. (R. at 24.) Based on Duncan's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Duncan could perform other jobs existing in significant numbers in the national economy, including jobs as an addresser, a general office clerk and a ticket checker. (R. at 24-25.) Therefore, the ALJ found that Duncan was not under a disability as defined under the Act and was not eligible for benefits. (R. at 25.) *See* 20 C.F.R. § 416.920(g) (2013).

After the ALJ issued his decision, Duncan pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-5.) Duncan then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2013).

-3-

Case 2:13-cv-00028-PMS   Document 19   Filed 10/01/14   Page 3 of 19   Pageid#: 1622

stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2013). The case is before this court on Duncan's motion for summary judgment filed January 6, 2014, and the Commissioner's motion for summary judgment filed February 10, 2014.

## II. Facts[5]

Duncan was born in 1979, (R. at 292, 294, 309), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Duncan has a high school education. (R. at 315.) Duncan has past work as a cashier, a waitress, a convenience store clerk and an assembly worker. (R. at 83-84, 316.) Duncan testified at her hearing that she was incarcerated in April 2008 for prescription fraud. (R. at 64-65.) She stated that she abused prescription medication until she went to jail.[6] (R. at 65.) Duncan stated that she had never been able to keep a job for more than two or three months at a time because she did not like being in public around people and she did not want to talk to people. (R. at 73.)

AnnMarie Cash, a vocational expert, also was present and testified at Duncan's hearing. (R. at 81-97.) Cash was asked to consider an individual of Duncan's age, education and work experience, who had the residual functional

---

[5] Duncan does not challenge the ALJ's finding with respect to her alleged physical impairments. Therefore, the discussion of the medical evidence will be limited to those records pertaining to Duncan's mental health.

[6] On October 29, 2009, Dr. Bentley told Duncan that due to her drug screen being positive for cannabis and her noncompliance with pill count, narcotics would no longer be prescribed for her. (R. at 990.)

-4-

capacity to perform simple, routine, repetitive medium work[7] that was free of fast-paced production requirements and that required only occasional interaction with the public and co-workers. (R. at 84.) Cash stated that there was a significant number of jobs that existed that such an individual could perform, including jobs as a dishwasher, a food prep worker and a stock clerk. (R. at 85-86.) Cash was asked to consider the same individual, but who had the residual functional capacity to perform simple, routine, repetitive light[8] work that required no more than occasional climbing, balancing, stooping, kneeling, crouching and crawling, and that did not require concentrated use of moving machinery and exposure to protected heights or more than occasional interaction with the public. (R. at 87.) Cash stated that such an individual could perform Duncan's past work as an assembler. (R. at 87.) She also stated that other jobs existed in significant numbers that such an individual could perform, including work as a silverware wrapper and a stock clerk. (R. at 88.) Cash was asked to consider the same individual who could perform simple, routine, repetitive sedentary work that allowed only occasional climbing, balancing, stooping, kneeling, crouching and crawling, frequently reaching in any direction, including overhead, with the right upper extremity, who should avoid concentrated use of moving machinery and exposure to unprotected heights and who could have only occasional interaction with the public and co-workers. (R. at 89-90.) She stated that such an individual could perform other jobs that existed in significant numbers, including jobs as an addresser, a general office clerk and a ticket checker. (R. at 91.) Cash stated that these jobs also would be

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2013).

[8] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2013).

available for an individual who required a sit/stand option and who could perform only occasional handling. (R. at 93.) She stated that there would be no jobs available that such an individual could perform should they miss more than two days of work per month, who would be off task 20 percent of the time and who would have no useful ability to deal with work stress or to demonstrate reliability. (R. at 94-95.)

In rendering his decision, the ALJ reviewed records from Louis Perrott, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Gale Jackson, M.D.; Dr. Uzma Ehtesham, M.D., a psychiatrist; Dr. Kevin Blackwell, D.O.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Norton Community Hospital; Bristol Regional Medical Center; Wise County Behavioral Health Services; and Dr. Jody Bentley, M.D.

The reports contained in the record show that Duncan has suffered from substance abuse and psychological problems for years. In 2003, Duncan was treated at Norton Community Hospital for a drug overdose resulting in respiratory failure. (R. at 397-99.) A urine drug screen was positive for the use of benzodiazepines, tricyclics, antidepressants, opiates and marijuana. (R. at 399.) The admission note states that Duncan suffered from depression. (R. at 398.) The note also states that Duncan was found unresponsive at home with an empty Xanax prescription bottle that had been filled the same day. (R. at 398.) Duncan later denied any suicide attempt. (R. at 397.)

Duncan was involuntarily committed for inpatient psychiatric treatment in March 2006. (R. at 1028-30.) A toxicology screen performed on Duncan earlier

that same month was positive for the use of amphetamines, barbiturates, benzodiazepines, cocaine, opiates and tricyclics. (R. at 494.) A screen performed in January 2006 was positive for the use of marijuana in addition to morphine and benzodiazepines. (R. at 625.) Upon admission for inpatient treatment, Duncan admitted that she had been abusing her prescribed Lortab and Xanax. (R. at 1028.) Duncan stated, "I have a drug problem." (R. at 1035.) She also admitted to smoking marijuana and drinking alcohol on occasion. (R. at 1035, 1040.) Upon intake, one of Duncan's goals for the hospitalization was "complete detox." (R. at 1044.) Duncan was discharged five days later. (R. at 1026-27.)

It appears the effort to wean Duncan off her dependence on Lortab failed, however, because she returned to using opiates without a valid prescription within a few months. (R. at 739, 741.) She also admitted to continued use of marijuana. (R. at 741, 748.) Duncan, again, entered inpatient detoxification at The Laurels in February 2008. (R. at 725, 727.) At the time of her admission, Duncan tested positive for the use of opiates, benzodiazepines, marijuana and methamphetamine. (R. at 727.) Duncan left six days later against medical advice. (R. at 727.)

After leaving The Laurels, Duncan returned to treatment at Wise County Behavioral Health Services. (R. at 762-64.) Upon intake, Duncan stated that she had recently been convicted for prescription fraud and had spent 42 days in jail before being placed on probation. (R. at 762.) Duncan stated that she recently had tested positive for the use of cocaine and feared that she might be returned to jail. (R. at 764.) Duncan stated that she began abusing opiates by snorting them from the age of 18 until a month prior. (R. at 763.) She also stated that she had smoked marijuana since age 13 and snorted cocaine since age 19. (R. at 763.) Duncan was

diagnosed with opioid abuse, antisocial behavior disorder and cocaine abuse. (R. at 763.)

On March 15, 2009, Dr. Kevin Blackwell, D.O., examined Duncan at the request of Disability Determination Services. (R. at 819-22.) Dr. Blackwell noted that Duncan was alert, cooperative and oriented with good mental status. (R. at 820.)

A May 28, 2009, Discharge Summary noted that Duncan had a positive drug screen on admission. (R. at 872.) This was likely due to the fact that Duncan returned to the use of Lortab in early May 2009 after it was prescribed by Dr. Jody Bentley, M.D. (R. at 1069.) It appears Dr. Bentley intended to treat Duncan with Lortab on a short-term basis pending referral to pain management. (R. at 1067, 1069.) Duncan, however, never attended her pain management referral. (R. at 1059.) On October 27, 2009, Dr. Bentley told Duncan he would no longer prescribe narcotic pain medicine for her due to her drug screen being positive for the use of marijuana and her noncompliance with pill counts. (R. at 1059.)

For her complaints of depression and anxiety, Duncan primarily treated with Dr. Uzma Ehtesham, M.D., a psychiatrist. (R. at 1001-11, 1337-51, 1355-62, 1475-90, 1515-22.) Upon her initial evaluation by Dr. Ehtesham on September 15, 2008, Duncan did not disclose her long history of substance abuse or her recent drug-related conviction. (R. at 777, 794.) In fact, Duncan denied any previous substance abuse history. (R. at 777, 792.)

Mental status examinations by Dr. Ehtesham generally showed that Duncan's mood appeared depressed or anxious, but she had fair insight, intact judgment, goal-oriented thought processes and no hallucinations or suicidal or homicidal ideation. (R. at 1001-03, 1006, 1008, 1010, 1016, 1018, 1071, 1073, 1075, 1086, 1088, 1090, 1342, 1344, 1346, 1348, 1350, 1355, 1357, 1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.) Duncan was cooperative and appropriately groomed, her speech was normal, and she displayed normal psychomotor skills. (R. at 1002, 1006, 1008, 1338, 1344, 1346, 1348, 1350, 1355, 1357, 1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.) Dr. Ehtesham assessed Duncan's anxiety on a scale of one to 10, and consistently concluded that her anxiety ranked between two and five; and Dr. Ehtesham's treatment notes also indicated that Duncan's symptoms were stable and improved with medication. (R. at 1006, 1008, 1010, 1016, 1018, 1071, 1073, 1075, 1086, 1088, 1090, 1092, 1338, 1342, 1344, 1346, 1348, 1350, 1355, 1357, 1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.)

With no knowledge of Duncan's prior substance abuse, Dr. Ehtesham returned Duncan to the use of Xanax in October 2008. (R. at 786.) It appears Dr. Ehtesham continued to prescribe Xanax during the period relevant to Duncan's current claim. (R. at 800-08, 1374.)

On April 23, 2010, Dr. Ehtesham completed a mental assessment indicating that Duncan had a seriously limited ability to function independently, to understand, remember and carry out complex job instructions and to maintain personal appearance. (R. at 1020-22.) She indicated that Duncan had no useful

-9-

Case 2:13-cv-00028-PMS   Document 19   Filed 10/01/14   Page 9 of 19   Pageid#: 1628

ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to maintain attention/concentration, to understand, remember and carry out detailed and simple job instructions,[9] to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1020-21.) Dr. Ehtesham opined that Duncan was permanently disabled. (R. at 1022.)

On June 25, 2010, Dr. Ehtesham completed a Mental Status Evaluation Form for Disability Determination Services. (R. at 1337-41.) Dr. Ehtesham reported that Duncan suffered from bipolar disorder with psychotic features. (R. at 1337.) She found that Duncan's ability to have a relationship with family, friends and co-workers was impaired. (R. at 1337.) She reported that Duncan was suicidal and could become violent without medications. (R. at 1338, 1340.) Duncan's thought content and organization was described as illogical, and it was noted that she experienced confusion at times. (R. at 1338-39.) It was noted that Duncan's ability to remember and concentrate had decreased, and her judgment and fund of knowledge was considered poor. (R. at 1338-39.)

On August 16, 2010, Dr. Ehtesham completed a mental assessment indicating that Duncan had a seriously limited ability to use judgment, to interact with supervisors and to understand, remember and carry out complex job instructions. (R. at 1366-68.) She opined that Duncan had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple job instructions, to

---

[9] Dr. Ehtesham's assessment makes no effort to explain her opinion that Duncan was more proficient at complex job instructions than detailed or simple job instructions.

maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1366-67.) Dr. Ehtesham opined that Duncan was permanently disabled. (R. at 1368.)

On September 6, 2011, Dr. Ehtesham completed a mental assessment indicating that Duncan had no useful ability to make any occupational, performance or personal/social adjustments. (R. at 11491-93.) Dr. Ehtesham again opined that Duncan was permanently disabled. (R. at 1493.)

On January 9, 2012, Duncan reported that her depression had decreased and was stable on medication. (R. at 1515.) That same day, Dr. Ehtesham completed a mental assessment indicating that Duncan had a seriously limited ability to relate to co-workers, to interact with supervisors, to understand, remember and carry out complex job instructions and to maintain personal appearance. (R. at 1512-14.) She opined that Duncan had no useful ability to follow work rules, to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed and simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1512-14.) Dr. Ehtesham opined that Duncan was permanently disabled. (R. at 1514.)

On March 12, 2010, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Duncan suffered from an affective disorder. (R. at 137.) He found that Duncan had mild restrictions on her ability to perform activities of daily living. (R. at 137.) Perrott opined that Duncan had moderate difficulties in maintaining social

-11-

Case 2:13-cv-00028-PMS   Document 19   Filed 10/01/14   Page 11 of 19   Pageid#: 1630

functioning and in maintaining concentration, persistence or pace. (R. at 137.) He also opined that Duncan had experienced one or two episodes of decompensation for an extended duration. (R. at 137.)

Perrott completed a mental assessment indicating that Duncan was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and to respond appropriately to changes in the work setting. (R. at 140-42.)

On July 12, 2010, Eugenie Hamilton, Ph.D., another state agency psychologist, completed a PRTF indicating that Duncan suffered from an affective disorder. (R. at 156-57.) She found that Duncan had mild restrictions on her ability to perform activities of daily living. (R. at 156.) Hamilton opined that Duncan had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 156.) She also opined that Duncan had experienced one or two episodes of decompensation for an extended duration. (R. at 156.)

Hamilton completed a mental assessment indicating that Duncan was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and to respond appropriately to changes in the work setting. (R. at 160-61.)

On October 12, 2010, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Duncan at the request of Duncan's attorney. (R. at 1370-81.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Duncan obtained a full-scale IQ score of 71. (R. at 1371.) The Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), was administered, and Lanthorn noted that Duncan responded in a "somewhat random or unselective manner" to items toward the end. (R. at 1378.) Lanthorn noted that the MMPI-2 profile was to be interpreted with caution due to possibly being invalid. (R. at 1378.) Duncan reported that she had not consumed alcoholic beverages for the past two years. (R. at 1373.) She stated that, previously, she consumed alcohol on a daily basis and often times would consume as much as a fifth of liquor per day. (R. at 1373.) Duncan reported that in the past, she used cannabis and pain pills illicitly,

but that she had not used these for several years. (R. at 1373.) Duncan did not report that she previously had abused Xanax and was continuing to take it. Lanthorn diagnosed bipolar I disorder, most recent episode depressed, severe with psychotic features; panic disorder without agoraphobia; post-traumatic stress disorder, chronic; alcohol dependence in sustained full remission; and borderline intellectual functioning. (R. at 1379-80.) Lanthorn assessed Duncan's then-current Global Assessment of Functioning, ("GAF"), score at 50.[10] (R. at 1380.) Lanthorn reported that Duncan would have serious difficulties in her ability to function in gainful employment. (R. at 1381.)

Lanthorn completed a mental assessment indicating that Duncan had a satisfactory ability to understand, remember and carry out simple job instructions. (R. at 1382-84.) He opined that Duncan had a seriously limited ability to follow work rules, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed instructions and to maintain personal appearance. (R. at 1382-83.) Lanthorn found that Duncan had no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1382-83.) Lanthorn opined that Duncan would miss more than two days of work a month due to her impairments. (R. at 1384.)

---

[10] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

From July 2011 through December 2011, Dr. Gale Jackson, M.D., reported that Duncan was oriented to person, place and time, her insight and judgment were intact, and her affect was normal. (R. at 1525, 1528, 1531, 1534.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2014); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Duncan argues that the ALJ improperly determined her mental residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Duncan argues that the ALJ erred by failing to adhere to the treating physician rule and accord controlling weight to the opinion of Dr. Ehtesham. (Plaintiff's Brief at 5-7.) Duncan also argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn, who assessed her mental impairments and their impact on her ability to work. (Plaintiff's Brief at 5-7.) As noted above, Duncan does not challenge the ALJ's findings as to her physical impairments or her physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980),

-16-

an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Duncan argues that the ALJ erred by failing to give the assessments of Dr. Ehtesham and Lanthorn controlling weight. (Plaintiff's Brief at 5-7.) After a complete review of the evidence of record, I find Duncan's argument unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 416.927(c)(2) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Ehtesham and Lanthorn. The ALJ noted that he was giving little weight to the opinions of Dr. Ehtesham because they were not supported by the other evidence contained in the file and also were inconsistent with her own treatment notes. (R. at

-17-

23.) The ALJ further noted that he was giving some weight to Lanthorn's opinion regarding Duncan's ability to handle simple instructions. (R. at 23.) However, the ALJ noted that little weight was given to Lanthorn's opinion overall, as Duncan had the stomach flu on the day of the examination, and Lanthorn noted that testing results could be invalid based on Duncan's performance on the MMPI-2. (R. at 23, 1378.)

The fact that Duncan was not honest with these providers concerning her long substance abuse history would be basis enough for the ALJ's rejection of their opinions. Also, the internal inconsistencies in Dr. Ehtesham's mental assessments support the ALJ's rejection of these opinions. These providers' extreme mental restrictions also are not supported by their own evaluation and treatment notes. Mental status examinations generally showed that Duncan's mood appeared depressed or anxious, but she had fair insight, intact judgment, goal-oriented thought processes and no hallucinations or suicidal or homicidal ideation. (R. at 1001-03, 1006, 1008, 1010, 1016, 1018, 1071, 1073, 1075, 1086, 1088, 1090, 1342, 1344, 1346, 1348, 1350, 1355, 1357, 1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.) Duncan was cooperative and appropriately groomed, her speech was normal and she displayed normal psychomotor skills. (R. at 1002, 1006, 1008, 1338, 1344, 1346, 1348, 1350, 1355, 1357, 1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.) Dr. Ehtesham assessed Duncan's anxiety on a scale of one to ten, and consistently concluded that her anxiety ranked between two and five; and Dr. Ehtesham's treatment notes also indicated that Duncan's symptoms were stable and improved with medication. (R. at 1006, 1008, 1010, 1016, 1018, 1071, 1073, 1075, 1086, 1088, 1090, 1092, 1338, 1342, 1344, 1346, 1348, 1350, 1355, 1357,

1359, 1361, 1475, 1477, 1479, 1481, 1483, 1485, 1487, 1489, 1515, 1517, 1519, 1521.) In March 2009 Dr. Blackwell noted that Duncan was alert, cooperative and oriented with good mental status. (R. at 820.) From July 2011 through December 2011, Dr. Jackson reported that Duncan was oriented to person, place and time, her insight and judgment were intact and her affect was normal. (R. at 1525, 1528, 1531, 1534.) Furthermore, the ALJ relied upon the opinions of the state agency psychologists, who found that Duncan was capable of meeting the basic demands of competitive work on a sustained basis despite her mental impairments. (R. at 24.)

Based on this, I find that substantial evidence supports the weighing of the psychological evidence by the ALJ. That being so, I further find that substantial evidence supports the ALJ's finding as to Duncan's mental residual functional capacity and his finding that she was not disabled. An appropriate order and judgment will be entered.

DATED: October 1, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-19-

Case 2:13-cv-00028-PMS   Document 19   Filed 10/01/14   Page 19 of 19   Pageid#: 1638